Next case will be 06-1444, Galazo Contractors v. the Secretary of the Navy May I please the court, I'm Kenneth P. McKay, representing Galazo Contractors, Inc. I have requested the reservation of three minutes for a rebuttal. Although this case is fact intensive, the facts are largely not in dispute between the Navy and Galazo. This project was the first phase of five phases of a water main relining project in Mechanicsburg. Although it was labeled phase two, it was the first phase, and Galazo ultimately performed as either the prime contractor or the main subcontractor all five portions of this project. The bottom line is that the remedy that Galazo put in place on this phase remained the design accepted by the Navy on all subsequent phases. Notwithstanding the fact that what was left in place... The six inch T, is that what you're talking about? Yes, sir. The design, the key design? Yes, sir. What does it matter what they did later on? Well, it matters... The question is whether that was the specification for, in case anybody's puzzling about this, there's the contract, correct me if I'm wrong. Yes, sir. The contract required you all to build a bypass system because you were going to work on the existing water systems. Yes, sir. And the bypass system design, and this was a design, called for a four inch T at the bottom of a hydrant. Yes, sir. A four inch T that never worked. And you ended up putting in a six inch T. True, and the subsequent phases never showed that on the drawings either because the government didn't want to change the design, but they understood a six inch T was going to have to be used. And what's your issue? Well, the issue there is, first of all, that's a defective specification because the design specification, as the board reports correctly, required the four inch T. You're going outside the record to take what happened in succeeding steps with the project to sort of bootstrap yourself back in to showing that the four inch T was a defective design spec in this contract. Well, the record reflects the fact that the subsequent four phases used the six inch T. Well, look, as I understood it, one of your primary views was that the government's expert, Mr. Tabbitt, Robert Tabbitt, was able to testify on a matter that was critical of your expert's testimony about whether or not you could achieve the requisite degree of pressure with a four inch T, right? Exactly, Your Honor. That was the threshold issue. You mentioned the reconsideration decision of the board where you made the same argument that the board had abused its discretion in allowing Turbett to testify, right? And the board's response said that following the argument, counsel for appellant, that was you, I believe you were arguing the case there to the board. Yeah, I was trial counsel, yes, Your Honor. He says he withdrew your objection so long as he'd be afforded the opportunity to have Mr. Vialaski respond to Tabbitt. The government counsel of the government did not object and the board agreed to the request that transcript 11724. Unfortunately, we don't have that in our record here. Let me, it's very simple, apples and oranges. We removed our objection to allow Mr. Tabbitt to testify. We never removed our objection to his testimony because his testimony was unsupported by his expert report. That's the crux of the issue here, not the fact that he testified. We withdrew that objection because the board allowed us to file and our expert to testify to a reply report. Fine, allow Mr. Tabbitt to testify. Our objection, and this is what the board misses clearly in its reconsideration opinion. We've objected at least six times on the record to specific testimony of Mr. Tabbitt that was unsupported by his expert report. This is the federal rule 26 question. The shall versus what the board presiding judge did. 26A, which is a rule that is particularly germane to the proceedings of all the courts, but is of interest to the federal circuit because of the issues surrounding patents and other very technical issues. The expert has to be confined to the scope and conclusions formed within his report. If not, what you're allowing is for, in this case, the government to stray from its boundaries and dance to the tune of the affirmative expert in these kind of matters. I object that the board reached a conclusion there was no prejudice. Well, the board reached the conclusion. I mean, you're aware of the concept of harmless error. I am, Your Honor. There's virtually no trial ever occurs that's error free. There are all kinds of errors. And on appeal, people come up and say, well, there was an error. And the question is, where's the harm? Well, this certainly isn't harmless when the fact is that this board found that the 4-inch T was not a defective specification when all of the evidence clearly shows the 4-inch T never worked. And this expert testified as follows. Well. Did Mr. Dioslansky, he didn't testify in response to Tabit, right? He testified in response to Tabit's report. Right. And then Tabit gets up and starts talking a little bit. And Tabit puts in some stuff that's not in his report that he believes is responsive to what Dioslansky said. Then there was a big fight about whether Tabit should have been allowed to talk at all. And he said, no, it's okay for him to talk provided we can get at him, cross him. True. And as long as his testimony is within the bounds of Rule 26.  So you're citing Federal Rule of Civil Procedure 26A to B, if I'm correct. And the question is, and those rules, of course, apply to court proceedings. What is the authority for saying that the board, your case came before the Armed Forces Board, right? Armed Forces Board of Contract Appeals, yes, Your Honor. What is the authority for saying that Federal Rule 26 applies to the proceedings before an administrative board? Even the Navy concedes that that rule applies. In their brief, they rely upon it, too. And the other thing is, clearly in the proceedings and in this record. I don't know whether they can concede the law. They may be able to concede facts, but we have a legal question here. The extent to which the board is bound by the rules of civil proceedings. Well, the administrative procedures for the Armed Services Board of Contract Appeals clearly relies upon the Federal rules. Both for discovery and for evidentiary presentation at trial. But that's only, Rule 26 is the default. If the board did not exercise its discretion to allow something else, which in this case it did not. Certainly, Your Honor, but there isn't a jurisdiction. Rule 26 doesn't come into play in this case, does it? Rule 26 does come into play, but let's say for argument purposes it doesn't. There isn't a jurisdiction or a forum in the world that relies upon the taking of expert testimony. That doesn't confine that expert to the substance, opinions, and foundation provided in the report. If you don't do that, what kind of jury... Then what's the point of having the expert testify if you have the report in front of you? There's no point in having the expert testify. Well, clearly the expert report is made to tee up the entire case. To put the technical issues in the air for the experts to address. This is a notice issue. The experts testify for benefit of the judge in this case. I mean, although they're retained by counsel and by the side, it's clearly for the benefit of the judge. Well, for both sides to have an equal view of what their obstacle is to overcome in impressing that panel or that judge, the issues have to be defined and they have to be teed up and they have to be fairly played. Well, that's fair enough if your argument is that you did not have notice of what the government's expert was going to testify to and that prejudiced your position because you were never able to recover from the surprise. But as I heard you just a few minutes ago, and as I understand the record, you recovered very well. You cross-examined them, you put on your own expert and rebuttal, or sort of rebuttal, whatever you want to call it. We couldn't cross-examine Mr. Tabbitt sufficiently, nor could our expert. Because Mr. Tabbitt testified about issues and conclusions not in his report. Specifically, the Rule 26, your argument, the text of the rule says that it applies except as directed by the court. And in this instance, obviously the court, i.e. the board, directed otherwise because they said we're going to allow this to happen. Now, in terms of your argument that you just didn't really have enough of an opportunity to get at what you did, did you ask for an extension of time, a continuance? Did you say to the board, look, we're now being greeted through Tabbitt with some brand new stuff that wasn't in his report and we need a day or two for our expert to be able to think about that? I didn't see anything in the record that said you asked for additional time. We objected. But if you're going to try to argue that you were prejudiced and you were harmed because your fellow, you know, couldn't quite get up to speed fast, couldn't, you know, just jump right up and respond to Tarbett off the top of his head, in a circumstance when you're claiming at the bottom, as Judge Flager pointed out, ambush, then I would think you'd ask the presiding authority for an opportunity to say, look, sir, you're using your discretion to allow the Navy to do something that it ordinarily can't do. So you've got to lean on my side of the fence to help me get ready to respond. But I didn't see you ask for any of that time. I believe that it's our basis to preserve the objection and to state the basis for the prejudice. I don't think the frame of mind of the board is ever to grant a continuance. I think the expert wasn't smart enough to respond right away. Well, how can you be smart enough to respond to a question that has never been posed to him until the morning after he's testified? Well, because you sit there and listen. I mean, that's what a rebuttal, you're going to be rebutting in a few minutes. That's what a rebuttal is. You sit and listen to what somebody else says. You know, you don't come and claim prejudice because the Navy's lawyer said something that wasn't in her brief in response to questions of the hearing. Your Honor, with all due respect, look at the calculation contained in the appendix and appreciate the fact you wouldn't perform that calculation in court. These are experts. These are experts. And that expert isn't going to sit there 400 miles from home without his computer and without the program that he already prepared when he brought down there and gerrymander his way out of this predicament. Not only that, the Navy expert testified that, well, I could have done these calculations, but I didn't. It struck me that the killing scale of your argument is the board's finding that you were not prejudiced. The board listened to your argument on reconsideration. You had an opportunity to brief the board, correct, on reconsideration and to tell them chapter and verse where you were prejudiced. And, Your Honor, this is the same board that, in that opinion, completely misstated the basis of our objection. As you pointed out, she saw that our objection was allowing him to testify, and that wasn't our objection. The record's clear. The objection was the content. That was the first point you made when you came up. Let's hear from the government, and then you can come back in your rebuttal. Mr. Peace. May it please the court. The decision of the Armed Services Board of Contract Appeals should be affirmed because it did not abuse its discretion, and its decision is supported by substantial evidence in the record. May I ask you a question? Just assume, for purposes of argument, that the 4-inch T design spec was defective. Just assume that for purposes of argument. Then you'd probably have a problem here, wouldn't they? Your Honor, if the 4-inch T was found to be a defective specification, then that, I think, assumes some more— The short answer is yes, Your Honor. Just assuming that everybody agreed, and assumed the board had found that the 4-inch T spec was defective, then the contractor would be well on his way to some recovery, correct? Yes, Your Honor. Now, let me ask you this. If you look at page 23 of the blue brief, Mr. McKay's fine brief, you'll see in the last sentence of the first paragraph on the page, that even the Navy's representative responsible for the design admitted the specification was defective. Admitted it. Okay? Now, and then I believe it's over at page 33 of Mr. McKay's brief, where he says, lastly, the Navy, through testimony of its own technical witness, Mr. Stauffer, admitted the spec was wrong. Now, I assume, by the—oh, my goodness, if Mr. McKay is right, that there was a concession by the Navy's experts that the design spec was defective, ooh, he's got to win. So I looked in your brief. Now, maybe I missed it, but I didn't see any response to that argument. Your Honor, and I apologize if there wasn't a direct response to that, but in looking at the citations in— shouldn't I have seen a response in your brief to what is otherwise a winner, if he's right? Yes, Your Honor, and it may be, again, in looking at the brief, and it may be that I overlooked this aspect, but the problem with those citations that you see in the brief are, in fact, they cite things that do not constitute admissions by the Navy, and the Board did not find admissions by the Navy below. Well, I also looked at the record, and I didn't think that the record cites God and Mr. McKay where he belonged, but oftentimes we have missed citations to the record because, I mean, I suppose in at least three cases every month, the A cites are wrong, right? And so can I ask, did you try this case before the Board? No, Your Honor. You didn't, but you're familiar with the full record from the Board? Yes, Your Honor, and I found nowhere in the record where there was any admission. In fact, the citations described are descriptions by either the exporter or a witness about aspects of the contract but are not admissions that the 4-inch T was a defective specification. I take it you would prefer that we not consider this a waiver of that argument by the failures who have responded in your brief? No, Your Honor, and certainly not a waiver. In fact, I mean, the fact that the brief itself, its citations, did not support that claim. I apologize I didn't address it. There are many situations where not every single sentence is rebutted in our brief, but we do. Let's assume for argument purposes then that his statement that the Navy received it was a design defect. Let's assume that's not actually supported in the record. I couldn't find the support for it either. But moving to the question of whether it was a defective design element as a matter of court of law or fact, whichever it is, I'm not an expert in engineering, but it puzzles me because, and I may be wrong about this, my recollection of high school physics was that water is not compressible, and that what the board seemed to say was that it is true a 6-inch T would have solved the problem, but the contractor could have used that 4-inch T if they had used a 6-inch pipe. Do I understand that? That was one of the possibilities, Your Honor. That was one of the possibilities, and I puzzled about that a lot. I didn't have a 4-inch T and a 6-inch pipe to work with, so I didn't try to do an experiment. But I go back to my high school physics, and I say to myself, if water is not compressible, how would a 6-inch pipe help getting a quantity of water through a 4-inch opening any faster than a 4-inch pipe would get the water through there? And if that's true, then how did a 6-inch pipe solve the arguable defect in the 4-inch specification? Can you help me with that? Your Honor, I'm afraid I can't help you directly because I think you have a better recollection of your own high school physics or college physics than I do. Somebody in my physics. I don't know whether that's physics. That's why I'm asking you. However, the review here by the court is to review the board's decision and evaluation of expert testimony. And this court does not have to determine the underlying factual issues. But where the calculus comes in is the burden upon Collazo to prove that, in fact, it was a defective specification, that it could not have solved this within the performance specification aspect of the contract. That burden is theirs, and to the extent that their expert could not show that, in fact, it was impossible to meet the design specification, which the only design specification that was found was the 4-inch T, unless that expert and Collazo generally can show that it was not possible to meet contract requirements with that in place, they don't prevail. So in the government's position, that is, the board said the earth was flat and that the contractor didn't have, who was it, Galileo or whoever it was, that came up with the notion that I have to be a member of the flat earth society myself. But putting that aside, if the government, if the contractor didn't have an expert who could sufficiently establish that the earth was round, we would be obligated to accept the board's acceptance of the flat earth. No, Your Honor. If there was an ability to take judicial notice of an issue such as the earth being round, there certainly is some flexibility in that state. But here we don't have that situation. We have a number of possibilities that could have satisfied the contract performance requirements, one of which potentially may have been having larger pipes. In fact, there were larger pipes in the existing system, and the fact that the 4-inch pipes were used throughout the bypass system was not a design specification. Why did Mr. Tabbitt think that the 4-inch pipe would get the job done for the water pressure? The 4-inch T, Your Honor? The 4-inch T, pardon me. Your Honor, the 4-inch T, Mr. Tabbitt's complaint, essentially, about the report and the crux of what we're arguing about what was admitted, was that there was an assumption made by Mr. Diaslocki that a 42 pounds per square inch pressure was the highest pressure you could have. And although Colasso argues that this was, in fact, conceded by the expert, it wasn't. It was repeatedly questioned by Colasso's counsel, but, in fact, was not conceded, that 42 pounds per square inch was, in fact, the maximum that could be expected. Some of the exhibits that show some of the flow tests, in fact, show different and higher pounds per square inch ratings. This was taken at existing system hydrant number 13 and was argued to be the highest, but the evidence doesn't support that. It was not conceded. The question was the maximum pressure that can be achieved with a 4-inch T. Yes, Your Honor. The essential question. Well, there's two questions. The difference between the experts. It's a- The Navy's experts saying, I think a 4-inch T will work, and the contractor's experts saying, I don't think it will work. Yes, and even more to the point is Colasso's expert did not show by- did not prove that it, in fact, could not work. And so even absent- How would they have proved it other than to have an expert say it wouldn't work? Well, one of the ways- I mean, the fact that they had the expert say it wouldn't work is part of the proof, but the opposing expert pointed out, in fact, the court could have pointed out on its own had there not been an opposing expert. The simple logical possibilities that existed. So, for instance, that a 6-inch pipe could have been used, for one. It was not excluded. Another opportunity, which actually was recommended by Colasso's own employee, was that you use two 4-inch Ts. And both sides agreed that two 4-inch Ts would have been sufficient. There was nothing- Colasso doesn't argue there was anything in the specification that precluded them from using two 4-inch Ts instead of one 4-inch T, which would have met the performance requirements. So there are a number of different situations that potentially could have worked, one of which they conceded, or essentially conceded, would have worked. So, from your point of view, this is basically a substantial evidence case. Absolutely. It's a fight between the experts, and so long as the Dalbert, so long as the science passed, muster. Right? Absolutely, Your Honor. Absolutely, Your Honor. The experts were both testified. The experts were able to have additional cross or serve. Well, under the substantial evidence test, the board could have gone either way, right? Absolutely, Your Honor. Absolutely. I mean, I shouldn't say- Well, yes, I think the answer is that they could have gone either way. You can make a reasonable argument- Is there any merit, then, to the argument that was made here by Mr. McKay, that because the Navy used the 6-inch Ts for everything else afterwards, that there is at least a grain of salt, at least, to the argument that the board's choosing one expert over the other was arbitrary and capricious? No, Your Honor, because it's arguing two different aspects of the problem. Arguing, first of all, whatever alleged remedial efforts or later acceptance is not evidence of the prior defective investigation. But secondly-  I mean- Your Honor- The simple solution was a 6-inch T. Your Honor, it shows that one possible solution would have been to use 4-inch piping and 6-inch Ts. However, what that doesn't show is that the 4-inch T requirement was defective because other possibilities would also have been suitable and would have been within the contract requirements. And so Collazo's obligation was to meet the performance specifications given the design requirements. And the only design requirement here was a 4-inch T. And as the evidence shows, other opportunities, such as two 4-inch Ts, would clearly have been suitable and would have been within the specification. But in addition to that, other aspects such as perhaps a 6-inch pipe leading into a 4-inch T, notwithstanding our rudimentary physics, my rudimentary physics understanding, whether that would have increased the pounds per square inch- I don't know whether the pounds per square inch would have been able to increase. My rudimentary understanding would say that if we had increased flow coming into the- that we'd have increased pressure, and so the pounds per square inch would increase. But I don't know if that's true. I'm left- In my days in the Navy, water was our friend. But I'm left with the impression from these two cases that the Navy no longer knows how to deal with water. Respectfully, Your Honor, the- There's everything water on land and water in the sea. The issue here is that the Navy had a design that would have worked. And, in fact, COLAZO implemented that design and performance requirements in a way that did not work initially. And the abuse of discretion standard applies where the board decided to admit this expert testimony in a situation where there was shortened time frames, and that was not an abuse of discretion. And further, substantial evidence supports the decision of the board. Thank you, Your Honor. Thank you. Mr. McKay. Thank you. And in reverse order, Mr. Peace discussed the fact that Mr. Conley, the evaluator of the flow testing for COLAZO, suggested the use of two 4-inch tees. Again, the use of two 4-inch tees would have been a deviation from the specification. The Navy specified a single 4-inch tee. And the Navy did not adopt the recommendation of COLAZO's flow testing engineer. Now, you think it was just a small matter for COLAZO to substitute two instead of one 4-inch tee in all of this system? You're talking about thousands. You could have substituted two hydrants, which was another option that was available to you, and I believe you tried, didn't you? No. The fact is that you would have had to disconnect the system, install another tee, purchase and install another hydrant, and these hydrants run $1,400, $1,500 each. They're not just equipment that COLAZO has on hand. We were using the Navy's hydrants that were removed from the system, one for one, a single 4-inch tee for a single 4-inch hydrant. COLAZO should go out and buy hundreds of more hydrants for the Navy to install. The Navy didn't direct that they invoke that change. It was the Navy's design specification. Now, is this a defective specification? The testimony referred to is Mr. Stauffer's admission that subsequent phases of this project included the design changes for the flow testing and everything except the 4-inch tee. Well, why didn't they change the 4-inch tee? They did. 6-inch tees went in on all four subsequent projects. The Navy just looked the other way. Why? There was a claim. They weren't going to say, change the 4-inch tee to a 6-inch tee. They were just going to tell COLAZO, just get it done. Mind me, just get it done. So of course it was a defective specification. Of course the Navy knew it was a defective specification. The most telling piece of evidence in this entire case is Appellant's Exhibit 10, or excuse me, COLAZO's 10 at Appendix 305. The note from Mr. Stauffer, the engineer who testified at this trial as a professional engineer, who was to approve the flow testing, Ed Z., I guess we have to let COLAZO go do this. I don't know why the 6-inch tee works. It shouldn't, but it does. Caught him by surprise, didn't it? Unfortunately for us, the Navy understood thereafter, if they looked the other way, they didn't have to admit to this specification. Thank you. Case is submitted.